J-A33023-16

2017 PA Super 120

| HAROLD B. MURPHY, JR., WILLIAM J. MURPHY AND SIDNEY C. KARNEKE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| STEVE KARNEK, KARNEK FAMILY PARTNERS, LP AND RANGE RESOURCES APPALACHIA, LLC | |
| APPEAL OF:  STEVE KARNEK, KARNEK FAMILY PARTNERS, LP | |
| | No. 438 WDA 2016 |

Appeal from the Order Dated February 29, 2016
In the Court of Common Pleas of Washington County
Civil Division at No(s): 2015-1827

| HAROLD B. MURPHY, JR., WILLIAM J. MURPHY AND SIDNEY C. KARNEKE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellants | |
| v. | |
| STEVE KARNEK, KARNEK FAMILY PARTNERS, LP AND RANGE RESOURCES APPALACHIA, LLC | |
| | No. 550 WDA 2016 |

Appeal from the Order Dated February 29, 2016
In the Court of Common Pleas of Washington County
Civil Division at No(s): 2015-1827

J-A33023-16

BEFORE: LAZARUS, J., SOLANO, J., and STRASSBURGER, J.[*]

OPINION BY SOLANO, J.:                                    **FILED APRIL 21, 2017**

Before the Court are consolidated cross-appeals filed by Appellants Steve Karnek and Karnek Family Partners, LP, and Appellees Harold B. Murphy, Jr., William J. Murphy, and Sidney C. Karneke from the trial court's February 29, 2016 order disposing of the parties' cross-motions for summary judgment.[1] We affirm.

This matter arises out of an intra-family dispute regarding ownership of oil and gas underlying a parcel of land in Washington County that the parties have referred to as the "Scott Heirs' Farm." Determination of the ownership interests depends upon a series of deeds and wills. The two documents at the center of this dispute are a deed to John and Mary Pirih (the "Pirih Deed") and the will of Bessie Krynovske.

The Scott Heirs' Farm was conveyed by members of the Scott family to Joe Krynovske and Bessie Krynovske, husband and wife, in 1931. The conveyance was by a general warranty deed that described the property as

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Pursuant to Pennsylvania Rule of Appellate Procedure 2136(a), the parties have agreed that for purposes of these consolidated appeals, Steve Karnek and Karnek Family Partners, LP will be designated as Appellants, and Harold B. Murphy, Jr., William J. Murphy, Sidney C. Karneke, and Range Resources Appalachia, LLC will be designated as Appellees. *See* Letter, 6/28/16. Range Resources has not actively participated in this case, either in the trial court or in this Court.

- 2 -

consisting of 137 acres 20 perches in Smith Township.[2]  The deed excepted
certain mineral rights that are not at issue here.

On September 1, 1938, the Krynovskes separated the oil and gas
rights from the rest of the property by a series of transactions involving a
third party, A. Kirk Wrenshall. First, as husband and wife, the Krynovskes
conveyed the entire Scott Heirs' Farm property to Wrenshall.  Second,
Wrenshall conveyed the Scott Heirs' Farm back to Joe (but not to Bessie) by
a deed containing the following clause:

> EXCEPTING AND RESERVING hereout and herefrom all the oil
> and gas in or underlying said parcel of ground, together with the
> perpetual and irrevocable right, privilege, and easement of
> entering upon said lands and searching for, drilling wells, sinking
> shafts, mining, digging, extracting, taking and carrying away all
> of the oil and gas in or under said lands, or that may be found
> therein or thereunder;  and, also, the right of possession and
> use of so much of said premises at all times as may be
> necessary to the practical carrying out of the purposes and
> provisions of this exception, provided, however, that no wells
> shall be drilled within 200 feet of the buildings on said tract of
> land.

Third, Wrenshall conveyed to Bessie "for and during the term of her natural
life, with remainder over in fee to Joe Krynovske . . . ALL the Oil and Gas in
and underlying all that parcel of ground [comprising the Scott Heirs' Farm]
. . . BEING the same Oil and Gas and rights as Excepted and Reserved in
Deed of A. Kirk Wrenshall, unmarried, to Joe Krynovske, dated September 1,

_____

[2] A perch is 1/160th of an acre.  Black's Law Dictionary (10th ed. 2014).
Some documents in the record locate the farm in Burgettstown.

1938 . . . ." The parties agree that as a result of these transactions, (1) Joe owned the Scott Heirs' Farm, but not the farm's oil and gas and related interests (the "Oil and Gas"), and (2) Bessie owned a life estate in the Oil and Gas and Joe owned a remainder interest in the Oil and Gas.

In 1939, Joe and Bessie, as husband and wife, executed the Pirih Deed, which conveyed the Scott Heirs' Farm to John and Mary Pirih. The Pirih Deed contained an "EXCEPTING AND RESERVING" clause that was identical to the clause in the Wrenshall deed to Joe. It stated:

> EXCEPTING AND RESERVING hereout and herefrom all the oil and gas in or underlying said parcel of ground, together with the perpetual and irrevocable right, privilege, and easement of entering upon said lands and searching for, drilling wells, sinking shafts, mining, digging, extracting, taking and carrying away all of the oil and gas in or under said lands, or that may be found therein or thereunder; and, also, the right of possession and use of so much of said premises at all times as may be necessary to the practical carrying out of the purposes and provisions of this exception, provided, however, that no wells shall be drilled within 200 feet of the buildings on said tract of land.

The deed continued:

> THIS CONVEYANCE is also made UNDER AND SUBJECT TO a deed of A. Kirk Wrenshall, to Bessie Krynovske dated September 1st, 1938 . . . by which conveyance all of the oil and gas rights were conveyed to the said Bessie Krynovske.

One of the issues in this appeal is whether the Pirih Deed somehow terminated Bessie's life estate in the Oil and Gas and made Joe and Bessie owners of the Oil and Gas as tenants by the entireties.

Joe died intestate in 1959. He was survived by Bessie and five children: Helen Goodman, Mary Krynovske, Olga Murphy, Joseph Karneke, and Steve Karnek, Sr. The parties agree that if Bessie still had a life estate in the Oil and Gas at the time of Joe's death, then, under the then-prevailing law of intestacy,[3] Bessie inherited one-third (5/15) of Joe's remainder interest in the Oil and Gas and each of the five children inherited one-fifth of the remaining two-thirds (that is, 2/15 each) of the Oil and Gas.[4]

Bessie died testate on November 9, 1963. Her Last Will and Testament, dated June 9, 1962,[5] provided in Paragraph SECOND:

> I give, devise and bequeath all my real estate property to my daughter, namely Helen Goodman. Property consists of on [*sic*] lot 30 by 150 feet of the Gordon Land Co. Plan, Lot #192, situated at 567 Buena Vista Street, Canton Twp., Washington County, Penna. She is to receive all royalties from 7 oil wells situated on John Scott's heirs Farm, R.D. #3, Burgettstown, Pa. The wells are owned by Wolf Head Oil Refinery Co., Inc. Farm

_____

[3] The Intestate Act of 1947, 1947 P.L. 80 (Apr. 24, 1947), as amended.

[4] Each of their interests in the remainder therefore was:

| | |
|---|---|
| Bessie: | 5/15, or 33.333%; |
| Helen: | 2/15, or 13.333%; |
| Mary: | 2/15, or 13.333%; |
| Olga: | 2/15, or 13.333%; |
| Joseph: | 2/15, or 13.333%; |
| Steve Sr.: | 2/15, or 13.333%. |

[5] The will was probated under the name "Bessie Krznovke a/k/a Bessie Krznovcke a/k/a Bess Krznovski." The parties have acknowledged that the spellings of the principals' names have changed over the years. **See** Appellees' Brief at 5 n.4. No party contends that the different spellings of the names are material to this case.

No. 1013S. Also Helen Goodman will be her sister, Mary Krynovske, guardian and she is to live in the house during her entire life.

The will contained no residuary clause. Although there is no specific discussion of the issue in Bessie's will, the parties agree that one of Bessie's objectives was to take care of her daughter Mary, who apparently was unable to care for herself, by providing her with a guardian, a house (the devised property in Canton Township), and income. *See* Trial Ct. Op. at 7; Appellees' Brief at 23. The will appointed Helen as Mary's guardian and required Helen to live in the house, apparently so that she could care for Mary there. Letters testamentary were issued to Helen, and on October 27, 1964, the Orphans' Court issued an Adjudication and Decree awarding Helen the Canton Township property; the decree made no mention of Oil and Gas rights on the Scott Heirs' Farm or of royalties from those rights. *See* Washington County Orphans' Court Adjudication and Decree, No. 269 of 1964. One of the questions in this appeal is what interests in the Oil and Gas rights, if any, each of Bessie's children inherited upon Bessie's death.

Bessie's five children all are now deceased:

• Mary Krynovske died intestate in 1967. She was unmarried and had no children.

• Helen Goodman died testate in 1987. She left the house and lot in Canton Township to Olga Murphy, and stated that "all the rest, residue and remainder" of her estate was bequeathed to her brother,

Steve Karnek, Sr. In a handwritten note at the bottom of her will, she explained: "My brother, Steve Karnek, Sr., deserves all of what little I possess as he and I cared financially (physically healthwise), to Bessie Krynovske, mother and Mary, sister — both ill. No other family member aided."

• Steve Karnek, Sr. died intestate in 1988, survived by his wife, Lucy Karnek, and his son, Steven Karnek, Jr. (referenced in the litigation as "Steve Karnek"). In 2010, Lucy and Steve conveyed their interests to Karnek Family Partners, LP, a limited partnership. In 2014, Karnek Family Partners leased its interest in the Oil and Gas under the Scott Heirs' Farm to Range Resources Appalachia, LLC.

• Joseph Karneke died intestate in 1989, survived by his son, Sidney Karneke.

• Olga Murphy died testate in 2013. Her will left her entire estate to her two sons, Harold Murphy, Jr. and William Joseph Murphy.

On April 6, 2015, the heirs of Joseph and Olga — Harold B. Murphy, Jr., William Joseph Murphy, and Sidney C. Karneke ("the Murphy Plaintiffs") — filed the instant quiet title action against Steve Karnek and Karnek Family Partners ("the Karnek Defendants") and Range Resources in which they sought a declaratory judgment regarding ownership of the Oil and Gas. Specifically, the Murphy Plaintiffs asked the trial court to declare that Karnek Family Partners owns 50%, Harold and William Murphy each own 12.5%,

and Sidney Karneke owns 25% of those rights. They reached this result by assuming that (1) Bessie's life estate and Joe's remainder interest remained intact after execution of the Pirih Deed, (2) when Joe died, Bessie inherited one-third of Joe's remainder interest and the five children equally divided the remaining two-thirds; (3) when Bessie died, the five children equally divided Bessie's one-third interest among themselves; and (4) when each of the five children died, their interests then passed according to their wills or the intestacy laws.[6]

_____

[6] The Murphy Plaintiffs calculate each of the parties' interests this way:

• After Joe's death, Helen, Mary, Olga, Joseph, and Steve Sr. each owned a 0.13333 remainder interest in the Oil and Gas rights (**see** fn. 4, *supra*).

• Upon Bessie's death, Bessie's 0.33333 interest was divided equally among her five children, so that each received an additional interest of 0.06667 (0.33333 ÷ 5). That meant that each child's interest increased to 0.20.

• Because Mary died first and intestate, her interest was divided among her four siblings, so that they each received an additional interest of 0.05 (0.20 ÷ 4). That meant that each of the four remaining children's interests increased to 0.25.

• Helen died second, and her will gave her 0.25 interest to her brother Steve Sr. as part of the residue of her estate. That increased Steve Sr.'s interest to 0.50 (0.25 + 0.25). Steve Sr.'s interest passed to his wife and son, who then conveyed it to Karnek Family Partners. The Murphy Plaintiffs therefore concluded that Karnek Family Partners' interest is 50%.

• Joseph died next. His interest of 0.25 was inherited by his son Sidney Karneke. The Murphy Plaintiffs (which include Sidney Karneke) therefore concluded that Sidney Karneke's interest is 25%.

• Lastly, Olga's interest of 0.25 was inherited by her sons, Harold Murphy, Jr. and William Joseph Murphy, who therefore have an interest of 0.125 (12.5%) each (0.25 ÷ 2).

The Karnek Defendants filed a counterclaim asking the trial court to quiet title in their favor, enter an order ejecting the Murphy Plaintiffs from any possessory rights in the Oil and Gas, and issue an order determining the rights of the parties to the Oil and Gas. They claimed that 100% of the Oil and Gas is owned by Karnek Family Partners. They reached this result by assuming that: (1) the Pirih Deed caused the Oil and Gas rights to be owned by Joe and Bessie as tenants by the entireties; (2) Bessie therefore inherited 100% of those rights upon Joe's death; (3) Bessie's will devised 100% of those rights to Helen; (4) Helen's will devised all of her rights to her brother Steve Sr.; (5) Steve Sr.'s interest was inherited by his wife and son; and (6) Steve Sr.'s wife and son ultimately conveyed their interests to Karnek Family Partners.

The parties filed cross-motions for summary judgment.[7] On February 29, 2016, the trial court issued an opinion and order in which it agreed with the Murphy Plaintiffs that following the execution of the Pirih Deed, Bessie continued to own a life estate in the Oil and Gas and Joe continued to own the remainder interest. When Joe died intestate in 1959, Bessie inherited one-third of Joe's remainder interest and each of Joe's five children equally divided the rest. Trial Ct. Op. at 2. The trial court then

---

[7] Defendant Range Resources did not participate in the summary judgment proceedings. After becoming aware of the ownership dispute, Range Resources started paying rents and royalties into escrow while awaiting direction from the court. Trial Ct. Op. at 3.

departed from the Murphy Plaintiffs' analysis and concluded that when Bessie died in 1963 and her life estate disappeared, her one-third interest in the remainder interest passed, pursuant to her will, to Helen, from whom it then ultimately passed to Karnek Family Partners. *Id.* at 5-7. Thus, the court determined the ownership interests in the Oil and Gas to be:

- Harold Murphy – 1/12th (.08333, or 8.3%);

- William Murphy – 1/12th (.08333, or 8.3%);

- Sidney Karneke – 1/6th (.16667, or 16.7%);

- Karnek Family Partners – 2/3rds (.66667, or 66.7%).[8]

The trial court ordered Range Resources to distribute rents and royalties according to these shares.

---

[8] The court announced its decision in terms of fractions of the estate, rather than percentages, but for ease of reference we shall employ decimals here. The court agreed that upon Joe's death, each of the five children inherited a 0.13333 interest in Joe's remainder interest in the Oil and Gas rights. The court concluded that when Bessie died, Bessie's 0.33333 interest went to Helen, increasing Helen's interest to 0.46666. When Mary died, her 0.13333 interest was divided equally among the remaining four children, adding 0.03333 to each of their interests. Thus, Helen's interest increased to 0.49999. The other three children's interests increased to 0.16666 (1/6th). That is the ultimate interest inherited by Sidney Karneke, Joseph's son. That same interest was inherited by Olga and then split equally by her children, Harold and William Murphy, giving them each an interest of 0.08333 (1/12th). Karnek Family Partners received the 0.16666 interest inherited by Steve Sr. and his heirs plus the 0.49999 interest that Steve Sr. inherited from Helen, for a total interest of 0.66665 (2/3rds).

- 10 -

Both the Murphy Plaintiffs and the Karnek Defendants filed appeals from the February 29, 2016 order, and this Court consolidated those appeals.

The Karnek Defendants, as designated Appellants, raise the following issues:

1. Whether the Trial Court erred in ruling that Bessie Krynovske acquired a life estate and her husband, Joe Krynovske, held the remainder interest in the oil and gas following the conveyance to John and Mary Pirih in the deed dated [February 8,] 1939?

2. Whether the Trial Court erred in failing to determine the true intent of Joe and Bessie Krynovske as to their type of ownership of the oil and gas based on the Pirih Deed EXCEPTION and RESERVATION clause?

3. Whether the Trial Court erred in failing to hold the severance of the oil and gas estate in the Pirih Deed was a reservation of the oil and gas in the Grantors, Joe and Bessie Krynovske, as Tenants by the Entirety thereby extinguishing the life estate of Bessie Krynovske and the remainder interest of Joe Krynovske?

4. Whether Bessie Krynovske was a stranger in title in the Pirih Deed reservation thereby failing to vest entireties ownership of the oil and gas, in Bessie and Joe Krynovske?

5. Whether the Trial Court erred in ruling the Karnek Family Partners, LLP are owners of a two-thirds (2/3s) interest in the Oil and Gas Estate instead of owners of the entire estate?

Appellants' Brief at 4-5.

In their cross-appeal, the Murphy Plaintiffs, as designated Appellees, raise the following issue:

Did the trial court err in holding the Will of Bessie Krynovske devised her 1/3 interest in the oil and gas underlying the farm of the Samuel Scott heirs to Helen Goodman when both her Will and the Decree of Distribution specifically described the real

- 11 -

estate being devised to Helen Goodman as "property consists of on lot 30' by 150' of the Gordon Land Co. Plan, Lot No. 192, situated at 567 Buena Vista Street, Canton Twp., Washington County, Penna." And her Will specifically bequeathed only the ". . . royalties from seven oil wells situated on John Scott's heirs farm . . ."

Appellees' Brief at 2-3.[9]  In brief, the parties' issues challenge the trial court's interpretation of the Pirih Deed and Bessie's will.

In reviewing an order granting or denying summary judgment, this Court applies the following principles:

> Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.
>
> Summary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The reviewing court must view the record in the light most favorable to the nonmoving party and resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment.

*Shamis v. Moon*, 81 A.3d 962, 968-69 (Pa. Super. 2013) (citations omitted).

---

[9] The Murphy Plaintiffs also listed as an issue whether the trial court correctly ruled in their favor with respect to the Karnek Defendants' issues.

**The Pirih Deed (Appeal by the Karnek Defendants)**

The parties agree that Bessie Krynovske had a life estate in the Oil and Gas underlying the Scott Heirs' Farm after the September 1, 1938, deed from Wrenshall to Bessie that granted that interest. ***See*** Appellants' Brief at 12. The Karnek Defendants argue, however, that the Krynovskes' deed of the Scott Heirs' Farm to the Pirihs in 1939 somehow transformed the Krynovskes' interest in the Oil and Gas from a life estate in Bessie and remainder in Joe, to a tenancy by the entireties in Bessie and Joe.[10] They contend that this transformation occurred as a result of the "Exception and Reservation" clause in the Pirih Deed, which reads:

> EXCEPTING AND RESERVING hereout and herefrom all the oil and gas in or underlying said parcel of ground, together with the perpetual and irrevocable right, privilege, and easement of entering upon said lands and searching for, drilling wells, sinking shafts, mining, digging, extracting, taking and carrying away all of the oil and gas in or under said lands, or that may be found therein or thereunder; and, also, the right of possession and use of so much of said premises at all times as may be necessary to the practical carrying out of the purposes and provisions of this exception, provided, however, that no wells shall be drilled within 200 feet of the buildings on said tract of land.
>
> THIS CONVEYANCE is also made UNDER AND SUBJECT TO a deed of A. Kirk Wrenshall, to Bessie Krynovske dated September 1st, 1938 and recorded in the Recorder's Office of Washington County, Pennsylvania, in Deed Book Vol. 623, Page 251, **by**

---

[10] Property held as a tenancy by the entireties is jointly owned by a husband and wife and passes to the surviving spouse upon the other's death. ***See In re Estate of Bullotta***, 798 A.2d 771, 774 (Pa. Super. 2002), ***aff'd***, 838 A.2d 594 (Pa. 2003).

> **which conveyance all of the oil and gas rights were conveyed to the said Bessie Krynovske.**

*See* Appellants' Brief at 10-11 (quoting second paragraph;  emphasis in that paragraph added by Karnek Defendants).

The Karnek Defendants' argument is premised on the emphasized language in the foregoing provision, which states that Wrenshall's deed to Bessie conveyed "all of the oil and gas rights . . . to . . . Bessie Krynovske." The Karnek Defendants argue that the word "all" demonstrates that the Krynovskes did not intend "that Bessie's ownership of the oil and gas be limited to a Life Estate interest" and that instead the intent was for Joe and Bessie to own "all" of the Oil and Gas as tenants by the entireties.  *See* Appellants' Brief at 13.

In support of this construction, The Karnek Defendants surmise that Joe "had to believe" that Wrenshall was a "straw party" used to sever the Oil and Gas rights so that the Krynovskes could sell the surface land to the Pirihs while retaining the Oil and Gas rights. The Karnek Defendants further surmise that Joe, "as a lay person, didn't understand or agree with the legal concept of a Life Estate"; never intended "that Bessie's ownership in the oil and gas be limited to a Life Estate interest"; intended, as shown by the Pirih Deed, "that Bessie be considered owner of *all* of the oil and gas"; and declared in the Pirih Deed "his and Bessie's intent that they would own the entire fee in the oil and gas as Tenants by the Entireties." Appellants' Brief at 13 (emphasis in original). The Karnek Defendants argue that because

ownership of the Oil and Gas reverted to Bessie and Joe as tenants by the entireties, their survivor (who turned out to be Bessie) would be the sole owner of the Oil and Gas rights after the other died.

When interpreting deeds, "the court's 'primary object must be to ascertain and effectuate what the parties intended.'" *Mackall v. Fleegle*, 801 A.2d 577, 581 (Pa. Super. 2002) (quoting *Brookbank v. Benedum-Trees Oil Co.*, 131 A.2d 103, 107 (Pa. 1957)). The following rules of construction apply:

> (1) the nature and quantity of the interest conveyed must be ascertained from the instrument itself and cannot be orally shown in the absence of fraud, accident or mistake and we seek to ascertain not what the parties may have intended by the language but what is the meaning of the words; (2) effect must be given to all the language of the instrument and no part shall be rejected if it can be given a meaning; (3) if a doubt arises concerning the interpretation of the instrument it will be resolved against the party who prepared it; (4) unless contrary to the plain meaning of the instrument, an interpretation given it by the parties themselves will be favored; (5) to ascertain the intention of the parties, the language of a deed should be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed.

*Mackall*, 801 A.2d at 581 (quoting *Brookbank*, 131 A.2d at 107 n.6) (quotation marks and ellipses omitted)). As with any question of law, we review the trial court's construction of a deed *de novo*.

We disagree with The Karnek Defendants' interpretation of the deed, which appears to be based on mere speculation regarding Joe's intent and is inconsistent with our rules of construction. *See Mackall*, 801 A.2d at 581

("we seek to ascertain not what the parties may have intended by the language but what is the meaning of the words"). The Pirih Deed's words explicitly recognize that the conveyance made by that deed is "UNDER AND SUBJECT TO" Wrenshall's deed to Bessie that created Bessie's life estate and Joe's remainder interest in the Oil and Gas. The Pirih Deed's "Exception and Reservation" Clause relating to Oil and Gas rights is identical to the clause excepting Oil and Gas rights in Wrenshall's deed of the Scott Heirs' Farm to Joe, showing that, just as Oil and Gas was excepted from the conveyance to Joe, it also was excepted from the conveyance to the Pirihs. The Pirih Deed's language thus indicates that the parties' intent was **not** to change the life estate in the Oil and Gas that Bessie had obtained under the deed to her from Wrenshall; the Pirih Deed says that explicitly. That the Pirih Deed described the deed from Wrenshall to Bessie as transferring "all" of the Oil and Gas rights to Bessie does not alter this conclusion; the Wrenshall deed did convey all of the Oil and Gas to Bessie — for her life.

For this reason, we disagree with The Karnek Defendants' argument that the Exception and Reservation Clause in the Pirih Deed was a reservation of Oil and Gas rights to the Krynovskes, rather than an exception to the rights conveyed to the Pirihs. A reservation is the creation of a right or interest that did not previously exist; but if the thing or right exists at the time of conveyance, the deed's language is treated as making an exception **Ralston v. Ralston**, 55 A.3d 736, 741 (Pa. Super. 2012). Here, Bessie's

life estate existed before the conveyance to the Pirihs; the Pirih Deed therefore was excepting the Oil and Gas rights subject to that life estate, rather than creating a new right or interest in the Oil and Gas.

In this connection, the confusing discussion of the "Stranger in Title" rule that The Karnek Defendants have included in their brief is beside the point. "The common law rule is that generally a reservation/exception of rights in a stranger to a deed is ineffective to transfer any interests to the stranger." *In re Condemnation by County of Allegheny of Certain Coal, Oil, Gas, Limestone and Mineral Props.*, 719 A.2d 1, 3 (Pa. Cmwlth. 1998) (hereinafter *Allegheny*). The Karnek Defendants' brief raises the specter of this "rule" by noting that "[o]ne could argue that Bessie was a Stranger in Title, which would make the Deeded interest null and void." Appellant's Brief at 15. The Karnek Defendants then contend that the Commonwealth Court in *Allegheny* "adopted a modified form of the common law principle requiring the Court [to] examine the Grantor[']s 'Intent'." *Id.* at 15-16. The claimed import in this case of both this "rule" and of the Commonwealth Court's purported modification of it[11] are not at all

_____

[11] We are not bound by decisions of the Commonwealth Court. *Mariner Chestnut Partners, L.P. v. Lenfest*, 152 A.3d 265, 283 n.12 (Pa. Super. 2016). In any event, we disagree with The Karnek Defendants' interpretation of *Allegheny*. That case did not disregard or reinterpret the stranger-in-title rule in order to effectuate the grantor's intent. Rather, the court in *Allegheny* first held that an attempted reservation of mineral rights in a third party was ineffective. *Allegheny*, 719 A.2d at 3. In doing so, it
*(Footnote Continued Next Page)*

clear, but the Karnek Defendants apparently engage in this discussion to emphasize their desire that we examine the intent of the Krynovskes (and, in particular, that of Joe Krynovske) in signing the Pirih Deed. *See id.* at 17 (***Allegheny*** "emphasizes the obligation of this Court to closely examine the intentions of Joe Krynovske when he approved and executed the Pirih Deed").

We do not disagree with the importance of examining the parties' intent. But, contrary to the Karnek Defendants' argument, we discern the parties' intent by looking to the language of the deed. *See Mackall*, 801 A.2d at 581. Here, the plain language of the relevant clause in the Pirih Deed states that the deed is "UNDER AND SUBJECT TO" creation of the Life Estate in Bessie under the Wrenshall deed to Bessie. That clause is not ambiguous, and we therefore need look no farther to determine what the parties meant. The "Stranger in Title" rule and the Karnek Defendants' argument regarding that rule thus have no bearing on this analysis.

The Karnek Defendants also rely on *Alexa v. Alexa*, 23 Pa. D. & C. 3d 164 (C.P. Beaver Cnty. 1982), for the proposition that, "[w]hen a wife joins

*(Footnote Continued)* ――――――――――――

recognized that "there is a legal rule against attempting to accomplish by the language herein utilized what the parties wanted to accomplish, namely, reserve/except an interest in a non-party to the deed." *Id.* at 4. Then, the court examined the intent of the grantor when determining who owned the mineral rights in light of the failed reservation. *See id.* at 4 (holding that grantor retained interest). ***Allegheny***, we conclude, has no bearing on discerning what the parties intended by the Exception and Reservation Clause at issue here.

her husband as a grantor in a deed to convey husband's separately owned property, Pennsylvania courts have held that a new ownership interest can be created." Appellants' Brief at 16. We are not persuaded by **Alexa.** First, decisions of the courts of common pleas are not binding on this Court. **Ambrogi v. Reber**, 932 A.2d 969, 977 n.3 (Pa. Super. 2007), **appeal denied**, 952 A.2d 673 (Pa. 2008). Second, the portion of **Alexa** Appellants cite is *dicta*. **See In re Jacobs,** 936 A.2d 1156, 1162 (Pa. Super. 2007) (finding *dicta* from common pleas court decision "neither on point nor instructive"). Third, the *dicta* in **Alexa** concerned whether a new interest could be created where none existed before, while the issue in this case is whether a reservation in a deed, which expressly recognizes a prior deed, changes the interest created by the prior deed.

For the foregoing reasons, we hold that the trial court correctly concluded that until Joe's death, Bessie had a life estate and Joe had a remainder interest in the Oil and Gas.

### Bessie Krynovske's Will (Appeal by the Murphy Plaintiffs)

The Murphy Plaintiffs agree that the Pirih Deed did not alter Bessie's life estate in the Oil and Gas. They also agree that when Joe died in 1959, Bessie retained her life estate in the Oil and Gas and Joe's remainder interest passed by intestacy to Bessie and to his children, with Bessie receiving a 1/3rd interest in that remainder interest, and each of Joe's five children receiving an equal share of the rest (that is, they each received a

2/15ths interest). *See* Trial Ct. Op. at 2.  But the Murphy Plaintiffs disagree with the trial court's holding about what happened to these interests when Bessie died.  The trial court held that Bessie's 1/3 interest passed to her daughter Helen under Paragraph SECOND of Bessie's will, but the Murphy Plaintiffs contend that the will did not dispose of Bessie's 1/3 interest and that the 1/3 interest therefore passed by intestacy to Bessie's five children, for equal division among them.  If the Murphy Plaintiffs are correct, Karnek Family Partners would end up with only one-half of the Oil and Gas rights and the Murphy Plaintiffs would divide the other half among themselves; under the trial court's decision, however, Karnek Family Partners owns two-thirds of the Oil and Gas rights and the Murphy Plaintiffs' remaining shares are reduced accordingly.[12]

Paragraph SECOND of Bessie's will devised and bequeathed "all of my real estate property" to Helen.  It then said, "Property consists of" the lot containing the house in Canton Township and made reference to royalties from oil wells on the Scott Heirs' Farm, but did not otherwise mention Bessie's interest in the Oil and Gas underlying the Scott Heirs' Farm.  Therefore, the Murphy Plaintiffs argue that the real property devise to Helen

---

[12] In the trial court, the Karnek Defendants took the position adopted by the trial court that, through her will, Bessie devised her Oil and Gas interest to Helen. *See* Karnek Defs.' Cross-Mot. for Summ. J. at 13-15. They do not argue this issue in their brief to this Court, *see* Appellants' Brief at 24 (briefly mentioning will issue), and did not file a brief in response to the Murphy Plaintiffs' cross-appeal.

under this paragraph was only of the Canton Township lot because only that lot was specifically described by the phrase, "[p]roperty consists of." The Murphy Plaintiffs point out that the receipt of royalties can be held separately from any other interest in oil and gas, so that the will's reference to those royalties does not encompass the underlying Scott Heirs' Farm Oil and Gas rights. More generally, they argue that Bessie's intent was to leave a house where Helen could take care of her disabled daughter Mary, and also to leave royalty income that Helen could use for Mary's care. The Murphy Plaintiffs conclude that "[o]wnership of the gas in situ at the Scott Heirs' Farm was clearly not on [Bessie's] mind and irrelevant to her plan [to take care of Mary]." Appellees' Brief at 23.

> In interpreting a will, we are mindful of the following principles:
>
> It is now hornbook law (1) that the testator's intent is the polestar and must prevail; and (2) that his intent must be gathered from a consideration of (a) all the language contained in the four corners of his will and (b) his scheme of distribution and (c) the circumstances surrounding him at the time he made his will and (d) the existing facts; and (3) that technical rules or canons of construction should be resorted to only if the language of the will is ambiguous or conflicting or the testator's intent is for any reason uncertain.

*In re Houston's Estate*, 201 A.2d 592, 595 (Pa. 1964) (citations omitted). Thus, the primary goal of the construing court is to effectuate the intent of the testator. "In order to ascertain the testamentary intent, a court must focus first and foremost on the precise wording of the will, and if ambiguity exists, on the circumstances under which the will was executed." *In re*

*Estate of Weaver*, 572 A.2d 1249, 1256 (Pa. Super.) (citations omitted), *appeal denied*, 582 A.2d 325 (Pa. 1990). The words of a will are not to be viewed in a vacuum, and "specific words or phrases will be rejected when they subvert or defeat the testator's whole testamentary scheme and divest the bounty from those whom he obviously intended to benefit." *Id.* The interpretation of a will is a question of law, and thus our standard of review is *de novo* and our scope of review is plenary. *In re Estate of McFadden*, 100 A.3d 645, 650 (Pa. Super. 2014) (*en banc*).[13]

"One who writes a will is presumed to intend to dispose of all his estate and not to die intestate as to any portion thereof." *In re Grier's Estate*, 170 A.2d 545, 548 (Pa. 1961) (citation omitted). Moreover, the enumeration of particular items in a will, following a gift in general terms, does not reduce the effect of the general terms. *See Risk's Appeal*, 1 A. 85, 86 (Pa. 1885); *In re Rzedzianowski's Estate*, 25 A.2d 600, 604 (Pa. Super. 1942); 31 Standard Pa. Practice 2d § 150:55 (2012) ("The mere designation or enumeration of particular property in a residuary clause of a will is generally held not to make the legacy or devise of such property specific rather than general").

_____

[13] In the absence of a contrary intention appearing in the will, a testatrix's will is construed according to the law at the time of her death. *In re Linn's Estate*, 258 A.2d 645, 648 (Pa. 1969).

In **Risk's Appeal**, the testator's will stated, "For my wife, Mary E. Risk, to have all bonds and all the income thereof, and all money now on hand, and all the personal property is hers." 1 A. at 86. The Court held that although some personal property was specifically mentioned, all of the testator's personal property was included "under the general words, 'all the personal property is hers.'" **Id.**

In **Rzedzianowski's Estate**, the testator's will stated that he left "all his modest property, consisting of fields and three lots" to one person, Anna Borkowska. 25 A.2d at 601. When the testator died, he had $2,267.66, which was not explicitly mentioned in his will. **Id.** This Court concluded that the phrase "all my modest property" was not restricted by the subsequent description of particular property (fields and three lots), and that Anna Borkowska thus inherited the $2,267.66. **Id.** at 604. The court reasoned that "[t]he enumeration in the will of particular items after the gift in general terms 'of all my property' by the use of the words 'consisting of,' etc., did not abridge or cut down the effect of the general words."[14]

---

[14] The will in **Rzedzianowski's Estate** also expressly stated the testator's wish that his family receive nothing, thus overcoming the presumption that "an heir is never to be disinherited except by plain words or necessary implication." 25 A.2d at 603. While there is no similar expression of intent to disinherit anyone in Bessie Krynovske's will, we find **Rzedzianowski's Estate** instructive in construing a general gift followed by the enumeration of specific items.

Instantly, Bessie's will stated in relevant part, "I give, devise and bequeath **all** my real estate property to my daughter, Helen Goodman." Compl., Ex. B (emphasis added) (application for probate containing will of Bessie Krynovske). The trial court concluded that by devising "all" of her real property to Helen, Bessie intended Helen to receive her interest in the Oil and Gas. Trial Ct. Op. at 6-7. Oil and gas are "real property." **See Duquesne Natural Gas Co. v. Fefolt**, 198 A.2d 608, 610 (Pa. Super. 1964) ("So far as the law of property is concerned the ownership of oil and gas is similar to that of coal, where there are three estates of land, the coal itself, the surface and the right of support"). Therefore, the trial court held, Bessie's will conveyed the Oil and Gas rights to Helen, and that interest did not pass to her other children by intestacy.

We agree with the trial court that the description of the Canton Township lot, which followed the gift of "all my real estate property," did not, as the Murphy Plaintiffs argue, reduce the general devise. **See** Trial Ct. Op. at 7; **Risk's Appeal**, 1 A. at 86; **Rzedzianowski's Estate**, 25 A.2d at 601. The trial court's interpretation of the will is also consistent with the presumption against partial intestacy. **See Grier's Estate**, 170 A.2d at 548. Moreover, it is in harmony with Bessie's general intent in drafting her will: to care for Mary by giving her a place to live and by giving Mary's guardian (Helen) income to support them both. Trial Ct. Op. at 7 ("We will not read [the description of Bessie's house] to immediately reduce what she had just

given to Helen, especially since she was attempting to give Helen an income"). Although the Murphy Plaintiffs contend that "[o]wnership of the oil and gas in situ at the Scott Heirs' Farm was clearly not on [Bessie's] mind and irrelevant to her plan," Appellees' Brief at 23, we agree with the trial court that giving Helen ownership of the Oil and Gas would further Bessie's goal of providing income for Helen and Mary, especially since existing royalties were "based on [Bessie's] life estate" and might no longer be available after Bessie's death. *See* Trial Ct. Op. at 6-7. In sum, we discern no error in the trial court's conclusion that Bessie's will conveyed her 1/3rd interest in the Oil and Gas to Helen.

For the foregoing reasons, we affirm the trial court's February 29, 2016 order disposing of the parties' cross-motions for summary judgment.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/21/2017